# First National Bank of Decatur v. Johnston.

*Action on promissory notes.*

1. *What not assets within the meaning of Section 5242 Rev. St. of U S.* Notes given in renewal of other notes held by a National Bank, the original notes not being returned, are not "evidence of debt," or "assets of the Bank," within the meaning of Section 5242, Revised Statutes of the United States.

2. *Extension of time of payment, a valuable consideration :*—Negotiable paper transferred to secure a pre-existing debt, in consideration of an extension of the time of the payment of the debt, makes the

[First National Bank of Decatur v. Johnston.]

transferee a *bona fide* holder for value, and not subject to equities between prior parties of which he had no notice.

3. *Same.*—In such a case, notes afterwards substituted by mutual agreement of the parties, without any new consideration, for the collateral originally taken, will be in the same condition as the original collateral.

4. *What not a defense to an action on a note.*—As between the maker and innocent third parties, it is not a defense to an action on a note, that the name of the payee is left blank, the person to whom it was intrusted being deemed the agent of the maker, with full authority to fill such blank.

APPEAL from the City Court of Anniston.
Tried before Hon. B. F. CASSIDY.

BRICKELL, HARRIS & EYSTER, and KNOX & BOWIE, for appellants. (No brief came to the hands of the Reporter.)

J. J. WILLETT, for appellee, contended that having averred in the replication that the Decatur Bank had acquired the notes without notice, relieved Johnson of making such proof, citing *First National Bank v. Dawson*, 78 Ala. 67; *L. & N. R. R. Co. v. Johnson*, 79 Ala. 436; *Highland Avenue & B. R. R. v. Winn*, 9 So. Rep., and insisting that notes having blanks therein were non-negotiable, cited Tiedeman on Commercial paper, Sec. 17; Daniel on Negotiable Instruments Sec. 99; Parsons on Contracts, Sec. 250. As to the contention that the transfer of the notes of the appellant Bank to the Bank of Decatur are void, cited *Market National Bank v. Pacific National Bank*, 30 Hun. (N. Y.) 50; *Roberts, Receiver, v. Hill, Administrator*, 24 Fed. Reporter, 571; *Vernango National Bank v. Taylor*, 56 Penn. State Reports, and many other authorities, and submitted a lengthy written argument upon said question.

THORINGTON, J.—Appellee being indebted to the First National Bank of Sheffield on the 15th day of November, 1889, sent to said bank his two promissory notes, of that date, for $1,500.00 each, payable at ninety days, one of said notes being payable to appellee's own order and indorsed by him, and the other having the name of the payee in blank, but was indorsed by appellee. The two papers were given in renewal and extension of other paper of appellee held by the bank and which appellee expected to be surrendered in consideration of the two notes above described.

The Sheffield Bank, however, prior to receiving these two

renewal notes had traded appellee's original notes to the Merchants National Bank of New York.

At the time appellee delivered the two new notes to the Sheffield bank the latter was indebted to appellant, The First National Bank of Decatur, in the sum of sixty-two hundred dollars for collections which the Sheffield Bank had made for and on account of the Decatur bank. For the payment of this indebtedness the Sheffield bank sent appellant its cheque for that amount on its New York correspondent, payment of which was refused, and the cheque protested.

On being advised of that fact, the cashier of the Decatur bank went to Sheffield and in an interview with the cashier of the Sheffield bank, in answer to an inquiry as to the condition of the latter bank, was informed by its cashier that "he thought it was all right," and that the president, and another party, were then in New York and had informed him that all the arrangements necessary would be made to secure all needed funds. The cashier of the Decatur bank then stated to the cashier of the Sheffield bank that if sufficient collateral should be deposited with the former bank the money would be permitted to remain with the Sheffield bank for a week or ten days. This was agreed to and the collaterals were forwarded the next day by the Sheffield bank to appellant.

Among the securities so furnished was the note of one Boykin for $2,000.00, which was indorsed by one Floyd.

In reply to a letter written by the cashier of the Decatur bank as to the standing of the parties whose names appeared on the collaterals, the cashier of the Sheffield bank, on November 20, 1889, wrote, among other things, that Floyd, the indorser, was worth from $15,000.00 to $20,000.00 and was perfectly good; that he, the writer of the letter, did not know Boykin, the maker, but that he was known to the president of the bank. It was also stated in the letter that the president of the bank had succeeded in making arrangements for the money needed by the bank but it would require several days to close the matter as papers would have to be sent on by the Land Company.

About the 27th day of November, at the request of the cashier of the Sheffield bank, appellee's two renewal notes were exchanged by that bank with appellant for the note made by Boykin, and indorsed by Floyd, which had been placed with the Decatur bank as collateral security as above stated. When this exchange of securities was made, in answer to an inquiry from appellant's cashier, it was re-

presented by the cashier of the Sheffield bank that appellee was perfectly solvent and the exchange was made, on the faith of this statement, for the accommodation of the Sheffield bank.

The Sheffield bank continued business until the 29th day of November, 1889, when its doors were closed, its business discontinued and a receiver was appointed by the Comptroller of the Currency on the 23rd day of December, 1889.

At the time the renewal notes of appellee were so substituted for the Boykin note, indorsed by Floyd, the Sheffield bank had defaulted on its obligations to the amount of twenty-five thousand dollars and had gone to protest; the president of the bank owed the bank over fifty thousand dollars, and it was known to the cashier of the bank that unless the president succeeded in making arrangements in New York, or otherwise, the bank could not pay its creditors in full and would have to close its doors; but the president had informed the cashier that all necessary arrangements had been made and that the bank would have sufficient funds to meet its liabilities and continue its business as usual.

None of the officers of the Decatur bank were informed at the time of receiving the collaterals, or the substitution of securities as aforesaid, of the amount of indebtedness owing to the Sheffield bank, but were informed that all necessary arrangements had been made to protect its paper and enable it to continue its business as usual, and relied on that information.

At the time appellee forwarded to the Sheffield bank the two renewal notes, the original notes in lieu of which they were given, were in New York in the possession of the Merchants National Bank, the same having been discounted with that bank by the Sheffield bank in the usual course of trade, and the cashier of the Sheffield bank negotiated the renewal notes to the Decatur bank, as above stated, without taking up and returning the original notes to appellee.

The cashier of the Sheffield bank testifies that when he transferred the two renewal notes to the Decatur bank, in the place of the Boykin note, he supposed the original notes of appellee were in the bank, and he intended to return them forthwith to appellee, having, at that time, forgotten that they had previously been transferred to the New York bank, and he did not discover the mistake until after the failure of the Sheffield bank, he received a telegram from appellee inquiring about his notes and demanding a return of the original notes. Appellant had no notice before re-
Vol. 97.

[First National Bank of Decatur v. Johnston.]

ceiving the two notes of appellee that they were given in renewal and extension of original notes.

Appellee is being sued by the New York bank on the original notes, and by the Decatur bank, in this action, on the renewal notes.

Appellee pleaded the general issue, and want of consideration, and failure of consideration, the last two pleas setting up many of the facts above stated.   There were also two pleas setting up the insolvency of the Sheffield bank at the time of the transfer of the notes, that the transfer was made in contemplation of insolvency, and after an act of insolvency, and that a preference was intended and that the transfer was void under the provisions of Section 5242 of the Revised statutes of the United States.

Demurrers were interposed to the pleas by the plaintiff and overruled by the court.

The plaintiff filed two replications averring that it acquired the notes in the regular course of business before maturity, for a valuable consideration, and without notice of any of the matters of defense set up in the pleas.

The case was tried before the court, without a jury, pursuant to the act establishing the court; and the issues were found in favor of the defendant and judgment entered accordingly.

We have stated the facts fully for the reason that we are required by the act creating the court to review the conclusions and judgment on the evidence, without any presumptions in favor of the ruling of the court.

Section 5242 of the Revised Statutes of the United States, so far as material to this case, declares that "all transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any National Banking Association, or of deposits to its credits,  ·  ·  ·   or other valuable thing for its use, or for the use of any of its shareholders or creditors ·  ·  ·   made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with the view to a preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void, &c."

The object of this statute, manifestly, is to secure the preservation, and distribution among all its creditors, of the assets belonging to the bank, fairly and without preferences.

By its terms it operates only upon notes, and other evidences of debt, *owing to* any national bank and which are

*assets* of such bank. Preferential transfers of such notes, only, are avoided by this statute. Transfers by the bank of notes and other evidences of debt in its possession which are not part of its assets, but the property of another, are not within the letter or influence of this statute and the validity of such transfers must be determined independently of its provisions.—*Com. Exchange Bk. of Chicago v. Blys.* 101 *N. Y.* 303.

The notes sued on in this action were never evidences of debt *owing* to the Sheffield National Bank, nor any part of its *assets*, within the meaning of the statute; they were executed by appellee for a specific purpose only, viz. in renewal and extension of two original notes which were to have been delivered up, and when they were sent by appellee to the Sheffield National Bank for that purpose they could only have become *assets* of that bank, and *owing to it*, by taking the place of the original notes evidencing the debt the new notes were intended to renew or extend. Until they were so applied the position of the Sheffield bank in respect of said notes was nothing more than that of a bailee.

The original notes having prior to that time, been transferred by the Sheffield bank to the bank in New York, and being held and owned by the latter, the condition upon which the new notes were to become *assets* of and *owing to* the Sheffield bank was impossible of performance and has never been performed.

Had the new notes been in the possession of the Sheffield bank when it failed, and gone into the hands of the receiver they could not have been collected or distributed as assets of the bank, but would have been the property of and surrendered to appellee.

The transfer of these notes by the Sheffield bank to the Decatur bank did not, therefore, diminish or affect the assets of the former bank, and for that reason its creditors were in nowise injured or defrauded by the transaction, and it was not a preference or transfer upon which the statute operates.

The defense of appellee to the action, therefore, must be determined not by this statute, but by the general principles of the commercial law as recognized by this court.

The contention of appellant that this statute has no application to the case because the Sheffield bank was not the owner of appellee's notes is not inconsistent with its claim of being a *bona fide* purchaser for value from the Sheffield bank. It is a familiar principle of commercial law that one to whom negotiable paper is entrusted, though himself hav-

[First National Bank of Decatur v. Johnston.]

ing no title, is capable of transferring an unassailable title to a purchaser in good faith relying on the possession.—*Murray v. Lardner, 2 Wall.* 110.

Treating both papers, for the present, as negotiable promissory notes we take up the inquiry whether by their transfer to the First National Bank of Decatur, under the circumstances herein above detailed, that bank became a *bona fide* purchaser thereof, for value, in the due course of trade and without notice of the equities existing between the transferror and the maker.

It is the established doctrine of this court that the holder of negotiable paper as collateral security for a pre-existing debt is not a *bona fide* holder for value, nor entitled to protection against equities and defenses existing between prior parties, of which he had no notice, but that such paper is open in the hands of such holder to all the defenses which could have been made against it while in the hands of the original owner.—*Miller & Co. v. Boykin,* 70 Ala. 469 ; *Connerly & Co. v. Plant. & Mer. Ins. Co.* 66 Ala. 432.

And it is the universally recognized doctrine that the holder of negotiable paper who acquires it before maturity, in the ordinary course of business, is presumed to have acquired it for a valuable consideration ; but, when illegality, want or failure of consideration, or bad faith in giving it circulation is shown, the holder must prove that he acquired it before maturity, and for a valuable consideration—that is, the payment of money, or other thing of value, or by the forbearance, postponement, suspension, or surrender of some legal right, or by changing his position in some respect for the worse.—*Connerly & Co. v. Plant. & Mer. Ins. Co. supra.*

It is not questioned that the collaterals originally transferred by the Sheffield Bank to appellant were taken by the latter as collateral security for a pre-existing debt, but it is urged that there was a new and independent consideration in the form of an agreement for indulgence or forbearance.

In Tiedeman on Commercial Paper, § 175 it is said: "Another common kind of consideration for the support of commercial paper, and of obligations issuing out of such paper, is the forbearance or extension of the time of payment. Whether an agreement to forbear for an indefinite period, as for "a reasonable time," is a sufficient consideration, has been differently decided by the courts, although the weight of authority is in favor of its being sufficient. But in order to be a sufficient consideration there must be an *agreement* to forbear ; mere forbearance, without the obligation to for-

bear, is not sufficient." The same author at page 273 § 167 further says: "Not only would forbearance be a sufficient consideration to make the indorsee of collaterals a holder for value, when the forbearance is provided for by express agreement, but, also, when it can be fairly implied from the nature of the transaction."

In 1 Parsons on Notes and Bills, page 224, it is said: "For the giving of time would be a present and a valuable consideration, and a pledge on these terms would be the same as a pledge for money paid down."

In 1 Daniel on Negotiable Instruments, § 829 a, this doctrine is recognized and the author quotes from Redfield C. J. as follows: "The transaction possesses both the cardinal ingredients of a valuable consideration; it is a detriment to the promisee and an advantage to the promissor. And it is no satisfactory answer to say, that the party who takes such a bill or note is in the same condition as he was before. This is by no means certain. He has for the time foregone the collection of his debt, and in such matters time is of the essence of the transaction. And the debtor thereby gains time. It may be more or less, but of necessity some time is gained; and in such matters, this is always accounted an advantage, and is often of the most vital consequence to the debtor."

It is urged by appellant that there was a new and independent consideration supporting the transfer in the promise on its part to permit the money to remain with the Sheffield bank, provided sufficient collateral should be given.

The testimony relied on by appellant to show such an agreement, is the testimony of the cashier of the respective banks. The testimony of T. L. Benham, the cashier of the Sheffield bank, is as follows: "Littlejohn thereupon informed witness, Benham, that if sufficient collateral was deposited with him to secure said indebtedness, that he would permit the money to remain with the said First National Bank of Sheffield, for a week or ten days, that he would return to Decatur that day, and that Benham was to either send him the money or the collateral to secure the said indebtedness the next day." On the 18th of November, Benham wrote to Littlejohn enclosing the collateral, saying, among other things, "I enclose you herewith the following notes for collateral as advised you I would send."

The testimony of Littlejohn, cashier of the Decatur Bank, is as follows: "That T. L. Benham then requested him to leave the amount of $6,200.00 with his said bank for a few days, as it was not convenient for him to pay that amount at

that time. That witness, Littlejohn, then informed Benham' that he was perfectly willing to leave the balance with said bank for a week or ten days, provided sufficient collateral was deposited with him to secure that amount. That he would return to Decatur that day, and requested the said T. L. Benham, cashier, to forward him the money next day, or a sufficient amount of collateral to secure it.

At the time referred to in the above testimony, Littlejohn, the cashier of the Decatur bank, had gone to Sheffield to demand the entire amount due from the Sheffield bank. Twenty-five hundred dollars of the amount was paid, and the balance, $6,200.00, allowed to remain as above detailed by the witnesses.

According to this testimony, it seems to be established that the transfer of the collaterals was not simply induced by the forbearance of the collection of the principal debt, but that they were transferred in consideration of an express promise to forbear the collection of the debt for a week or ten days, and that such indulgence was in fact given.

The agreement is somewhat indefinite as to the time of the indulgence or forbearance, but not so much so as to render the agreement incapable of enforcement. In any aspect it was an agreement to forbear collection of the debt for at least a week from the time of the agreement, and whether for a week or ten days is immaterial.

There are many decisions in which much greater uncertainty in the terms of the agreement existed as to the time of the forbearance, than in this agreement, in which it is held the agreement constituted a valid consideration for the transfer.—1 Parsons on Notes and Bills, p. 198, and authorities cited in notes.

That the promise proved of detriment to the Decatur bank, is shown by the proof that the Sheffield bank, in a day or two thereafter (within less than a week), was compelled to close its doors, and went into the hands of a receiver appointed by the comptroller of the currency.

We are unable to perceive any sound principle upon which it can be held that the notes sued on are not protected by this agreement.

It is true they were not among the collaterals originally taken by the Decatur bank at the time of the agreement, but they were afterwards, by mutual consent of the parties, and without any new consideration, substituted in the place of one of the collateral notes originally taken. Under this arrangement, we think that the substituted notes, in their relation to the agreement for forbearance, partook of the

character of the note for which it was substituted, and was thereafter held by appellant in precisely the same plight and condition as the note whose place it took.

But if it should be conceded that the substitution of appellee's notes for the Boykin note was a new transaction, and independent of the promise or agreement for forbearance, the result can not be different, for in that event the surrender of the Boykin note was in and of itself a valuable consideration for the transfer of appellee's notes, and this is true whether the parties to the Boykin note were solvent or insolvent.—1 Daniel on Neg. Inst. § 827.

The author last cited, says : " The surrender of one collateral is a good consideration for the transfer of another, even though the former is worthless and the debt is not yet due." And the text is supported by numerous authorities cited in note 2 to said section.

In what has been said, we have treated both notes as negotiable paper, but appellee insists that the failure to designate a payee in one of the notes, there being a blank where the name of the payee should have been written, destroys its negotiability if it does not render the note altogether invalid.

The law on this subject is well settled to the contrary. The result of the authorities is stated in 2 Amer. & Eng. Ency. of Law, page 339, as follows : " The delivery of a note or bill containing blanks, impliedly authorizes the holder to fill them as he pleases, unless restrained by the instrument itself." And this authority extends to all parts of the document delivered, e. g., the signature of the drawer's name, the payee's name, the date, the time of payment, the rate of interest, the place of payment, and the amount to be paid.

In Tiedeman on Com. Paper, § 35, it is said with reference to bills and notes executed in blank : " Such negotiable instrument carries on its face an implied authority to fill up the blanks and perfect the instrument; and as between such party and innocent third parties, the person to whom it was intrusted must be deemed the agent of the party who committed such instrument to his custody," or in other words, it is the act of the principal, and he is bound by it.

And in 1 Daniel on Neg. Inst., p. 143, it is declared that the party executing a blank note will be bound, although the holder pervert the power to fill the blank to an unintended use ; and at page 145, it is said that if the payee is left blank, the holder may insert his own name, but that the holder must actually fill the blank before he can recover.

[First National Bank of Decatur v. Johnston.]

And at page 146, that the holder, where there is an endorser but no payee, may insert the endorser's name as payee.

Another principle applicable to this particular note is that the payee is, in some cases, made the promisee by construction of law only. So that if the instrument, though not naming any certain payee on its face, furnishes the means by which the payee can be certainly ascertained, it is sufficient.—1 Parsons on Notes and Bills, p. 31. Here one of the notes is both made and indorsed by the same person, the appellee, with the name of the payee blank, and was delivered in that condition. The only reasonable inference arising from the indorsement is, that the maker was intended as the payee. Any other inference would render the indorsement an entirely unnecessary act.

The indorsement, under these circumstances, sufficiently indicates the payee, and makes it immaterial whether the blank was actually filled or not, before judgment was rendered.

Furthermore on this point, it is sufficient to add that no objection was made in the lower court which brings this question up for review here. We have noticed it simply because it has been pressed by counsel, who insist that if the case should be reversed as to the complete note, judgment must be rendered here for the defendant as to the blank note, upon the ground that the act creating the City Court of Anniston, requires us to render such judgment on the facts as the court below should have rendered.

While it seems that a great hardship is about to be inflicted upon appellee in consequence of the wrongful act of the Sheffield bank in transferring to appellant the notes sued on in this action, because of the likelihood that appellee will be compelled to pay both the original and renewal notes, we see no escape from the conclusion that the judgment of the City Court must be reversed, there being nothing in the proof to show that the Decatur bank had notice of the infirmities attaching to the notes, or of any fact which would have put it on inquiry.

The judgment of the City Court must be reversed, and a judgment here rendered for appellant, the plaintiff in the court below, for the demand mentioned in the complaint, and interest thereon, together with the costs of suit, and the costs of the appeal in this court and in the court below.

Reversed and rendered.